United States District Court
Northern District of Illinois

**RECEIVED**
3/30/2021 AM
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| Kevin Keeler, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) |
| V. | ) |
| | ) |
| | ) |
| Village of Oak Lawn, | ) |
| Oak Lawn Police Department | ) |
| Deputy Chief Mel Clark | ) |
| Circle K officer | ) |
| Officer O'Donnell badge no. 369, | ) |
| Officer Lupa badge no. 2190, | ) |
| Female intake officer 1, | ) |
| Female intake officer 2 | ) |
| Arresting officers at Dunkin Donuts, | ) |
| Officers on foot patrol at stop sign at major ave. | ) |
| Female unlawful eviction officer | ) |
| Officer P. O'Donnell badge no. 2257 | ) |
| Officer R. Carroll badge no. 2262 | ) |
| Officer G. Ferrer badge no.2268 | ) |
| Officer P. Curran badge no. 2137 | ) |
| Officer S. McNeela badge no. 2174, | ) |
| Head crushing officer | ) |
| Two rocketslide officers | ) |
| Forced entry officers, | ) |
| Defendants | |

**1:21-CV-01712**

Case no.

JUDGE THARP JR.
MAGISTRATE JUDGE WEISMAN

### COMPLAINT FOR VIOLATION OF CONSTITUTIONAL RIGHTS

NOW COMES the Plaintiff, KEVIN KEELER, pro se, and complains of the Defendants, by personal information as to his own activities and upon information and belief as to the activities of others and all other matters, and states as follows:

### NATURE OF ACTION

1.    This is a claim for violation of plaintiff's civil rights as protected by the

1

constitution and laws of the United States under 42 U.S.C. p. 1983, 1985, and 1986
and 720 ILCS 5/11-1.60 and 18 U.S.C. § 242.

2.  The court has jurisdiction under 28 U.S.C at 1343 and 1367.

3.  Plaintiff's full name is Kevin John Keeler.

### PARTIES

4.  KEVIN KEELER is a citizen of the United States and a resident of Oak
Lawn, Illinois.

5.  VILLAGE OF OAK LAWN  is an Illinois municipality located at
9446 S Raymond Ave. Oak Lawn IL, 60453.

6.  CIRCLE K OFFICER is the officer of OLPD that unlawfully arrested P
at the Circle K gas station and mini-mart at 10601 S Cicero Ave, Oak Lawn on or
around April 5, 2020 and caused towing  of P vehicle to unknown destination under
threat of illegal search and seizure.

7.  FEMALE EVICTION OFFICER is the female officer that unlawfully
evicted P from his residence along with Officer Lupa (2190).

8.  FEMALE INTAKE OFFICERS are the two female officers that
participated in sexually abusive and degrading search and sexual innuendo
discussion re P and sexual fondling of P while at intake at OLPD on or around May 5,
2019.

9.  FORCED ENTRY OFFICERS are OLPD officers that forced entry into P
bedroom.

10. ROCKETSLIDE OFFICERS are the two officers on foot that detained P
at Rocketslide Park.

11. HEAD CRUSHING OFFICER is the OLPD officer that crushed P head
against cinderblock wall.

12.     Plaintiff has been injured by Defendants' conduct and has suffered damages resulting therefrom.

## BACKGROUND

13.     On or around May 15, 2017 Plaintiff called the OLPD after he was intentionally locked out of his apartment by his roommate.

14.     Police ordered to move out of his residence immediately and not return.

15.     P stated that evictions were done by Cook County Sherriff after due process and not by the police department.

16.     Officer Lupa began screaming at P and threatening arrest.

17.     Plaintiff left on his bicycle and went to Oak Lawn Police Station.

18.     Plaintiff spoke with the sergeant at OLPD and told him what happened.

19.     Sergeant looked up the Illinois eviction law on his computer.

20.     Sergeant returned and agreed that P had legal tenancy at his home and therefore the police department could not evict him.

21.     Sergeant indicated that P was free to go.

22.     P requested that sergeant inform two said police officers that P was not evicted from his home.

23.     Sergeant agreed to inform the officers.

24.     That evening, Female Eviction Officer returned to P house and knocked on the door.

25.     P and his sister Judy Keeler were inside the apartment.

26.     Female Eviction Officer began questioning Judy through the door.

27.     Judy answered questions from officer.

28.     Said officer then advised Judy that P was using the tenancy laws against her.

3

29.     On or around May 16, 2017 Officer Lupa returned to P residence and entered and questioned P and sister Judy re the same issue of tenancy that had already been resolved as per Officer Lupas's sergeant.

30.     Officer Lupa did not suspect that Judy or P or anyone in the building had committed any crime or intended to.

31.     Officer Lupa was not conducting a police investigation of a possible crime when he entered P house.

32.     Approximately two weeks later P contacted deputy chief of police Mel Clark by email.

33.     P informed Clark at that time by email of said unlawful eviction and threats by officers to arrest P for trespassing at his own home.

34.     Deputy Chief replied via email.

35.     Deputy chief email indicated that there was nothing reported in email to the deputy chief that warranted an investigation or any action on his part.

36.     Lack of concern by deputy chief Clark pointed to a customary policy of OLPD  to allow unlawful bullying by officers  such as evicting residents on a whim and without due process.

37.     On or around June 10, 2017 P went to OLPD to request a FOIA request for re above unlawful eviction.

38.     P was then questioned by an OLPD officer regarding P role in the incident.

39.     P declined to make a statement at that time re his role.

40.     Officer became hostile toward P and demanded that P sit down at a bench.

41.     P felt threatened and was afraid of being arrested if he did not obey the officer order to sit at the bench.

42. P sat down at bench as per order of officer under duress of arrest.

43. P requested to talk to a supervisor.

44. Officer stated that the supervisor was busy.

45. P left the police station.

46. P called the station multiple times that day to talk to a supervisor.

47. P was repeatedly disconnected on those calls by the same officer who ordered P to sit at the bench.

48. P was not able to reach a supervisor re said incident.

49. P has still not been able to obtain a FOIA request re unlawful eviction by OLPD.

50. On or around August 18, 2018 the OLPD called P on the phone and requested him to meet them at the Dunkin Donuts parking lot at 103rd and Central Ave in Oak Lawn. Officer stated that the police just wanted to ask some questions and that P was not under arrest.

51. P rode his bicycle to said parking lot and met with two OLPD squad cars.

52. Police promptly confiscated P bicycle and Arrested P and took him to jail at OLPD and then took him to Cook County Jail.

53. There was no probable cause that a crime had been committed.

54. P alerted several police officers that he needed eye drops twice a day for glaucoma to prevent loss of vision.

55. P did not get eye drops while in custody of OLPD and OLPD did not inform Cook County Jail re said medical condition or prescription for eye drops.

56. On or around May 8, 2019 the OLPD surrounded P when he was walking thru the park adjacent to the Oak Lawn Public Library park in Oak Lawn.

57. Police were questioning P and demanded his i.d.

58. Police put handcuffs on P and went through his pockets.

59. P belt for his pants became loose when police dug their hands around in his pockets.

60. P belt was a double d-ring slip knot buckle and not the traditional leather with prong and holes type buckle.

61. P belt loosened more while walking with handcuffs on and police officers walking him along and holding onto each arm.

62. P alerted offices that he was struggling to keep pants from falling down.

63. OLPD officers continued to walk P toward OLPD station while restricting his arms in the same way.

64. P pants dropped and P was not wearing underwear.

65. Officers walked P for a while longer.

66. P pointed out that since there was a female officer watching him, it would be good to stop and help P with pants and belt.

67. Officers then stopped and assisted P with pants.

68. Consequent to above mishap, OLPD entered into the public record that P was arrested in the park for indecent exposure.

69. All officers present were cognizant that there was no probable cause for indecent exposure.

70. OLPD did not request the state of Illinois to file charges for indecent exposure.

71. Officers then took P to OLPD jail and locked him in.

72. Officers did not advise P as to probable cause for any crime that led to his arrest.

73. There was no probable cause for any crimes that led to P arrest.

74.     Officers were cognizant that there was no probable cause for any crime that might justify said arrest.

75.     At OLPD jailhouse in basement 2 officers restrained P who was already in handcuffs and not resisting any procedures of arrest while a third officer took P head in both hands and pushed it into a brick wall and then pushed it very hard against said brick wall and twisted P neck in order to better push head into wall.

76.     At least 2 other officers and a supervisor stood by during said physical abuse by fellow officers.

77.     P was subsequently taken to Cook County Jail where he was incarcerated for three days.

78.     P went without eyedrops for glaucoma again while incarcerated.

79.     P sustained optical nerve damage as a result of incarceration without meds.

80.     On or around July 15, 2019 P was walking thru Memorial Park in Oak Lawn when a OLPD officer approached and began questioning P.

81.     Officer 1 demanded that P follow him to where another OLPD officer 2 was standing.

82.     Officer 2 ordered P to stand next to a tree adjacent to the duck pond.

83.     P stood there for about 40 minutes.

84.     P was then released from custody.

85.     Officers did not indicate that there was probable cause for any crime that warranted said arrest.

86.     On or around August 5, 2019 P was sitting at duck pond at Memorial Park with a neighbor.

87.     Two OLPD officers approached from behind trees without identifying themselves or questioning P or neighbor re a suspected crime.

88.  One officer began digging through P backpack without a search warrant.

89.  Said officer took several items from the backpack and did not  return

90.  Officers left without further incident.

91.  P called OLPD and reported what had just happened.

92.  Approx six OLPD officers responded to call and P was questioned and handcuffed and taken by squadcar to OLPD.

93.  All P personal property including cell phone were confiscated by OLPD officers.

94.  Said cell phone still has not been returned.

95.  Officer drove P into the garage at OLPD.

96.  P was ordered to remain seated inside the squad car with handcuffs on.

97.  It was hot out at that time.

98.  Squad car is very small and P is 6'3' tall so not a good fit.

99.  After approx one hour officers let P get out of the squadcar.

100.  Officer took P temperature at that time.

101.  P temperature was at or around 102.5 degrees.

102.  OLPD officers then released P.

103.  P did not indicate any probable cause for said arrest.

104.  There was no probable cause for said arrest.

105.  OLPD officers were cognizant that no crime had been committed.

106.  On or around April 5, 2020 P was at the Circle K gas station and mini-mart at 10601 S Cicero Ave, Oak Lawn.

107.  An OLPD officer (John Doe) approached P and began questioning him.

108.  The officer then demanded that P remain where he was at.

109.  The officer then went inside and spoke with the cashier.

8

110.    P went inside to use the washroom.

111.    The officer confronted P when he walked out of the washroom.

112.    Officer demanded to know why P's face was wet.

113.    P stated that he had just washed his hands and face while in the
washroom.

114.    Officer took a pin flashlight from his pocket and examined P's eyes with
it.

115.    Officer stated that P appeared to be on drugs.

116.    The Circle K officer asked if P was on drugs.

116.    Cirkle K Officer stated that the OLPD knew that P used heroin.

117.    Officer demanded that P start his car and drive it.

118.    P did not start his car.

119.    Circle K officer threatened to put a parking ticket on P car if P did not
get in the car and drive it.

120.    P niece and her husband came to the Circle K. and P niece offered to
drive P car home.

121.    Officer stated that he would pull over and search P vehicle if anyone
tried to drive it home.

122.    Nobody wanted to drive it home under said threat of illegal search and
seizure.

123.    Officer put a parking ticket on P car and confiscated it.

124.    P was not charged with a crime during or after said detention and eye
examination and unlawful threat by said officer.

125.    Cirkle K officer aggressively questioned P re narcotics and insisted that
P had been using narcotics.

126.    There was no probable cause that P had been using narcotics.

127.    P had never been arrested for use or possession of narcotics or any other drug.

128.    There was no drug paraphernalia visible on the scene including when the officer shined a flashlight into P vehicle.

129.    P did not exhibit any physical or behavioral signs of being under the influence of narcotics.

130.    On or around May 1, 2020 P went to the OLPD desk clerk for copies of his arrest reports.

131.    A sergeant and officer approached P and requested that he talk to them around the corner instead of in the open lobby.

132.    P obliged and was then subject to intimidation including both officers berating him at the same time.

133.    Plaintiff asked if he could talk to one at a time and the junior female officer responded "no".

134.    Plaintiff was then ordered to leave the police station.

135.    Plaintiff left the station without arrest reports.

136.    On or around September 20, 2018 five officers from OLPD entered P closed and locked bedroom at his home and began questioning him.

137.     Police then handcuffed P and took him to OLPD jail.

138.    No charges were filed against P for any crime.

139.    Police released P the following morning after being given cash bond money by P friend Thomas Koutsoheras.

140.    On or around February 15, 2020 P was at Memorial Park in Oak Lawn when two men dressed like police officers with guns walked up and began searching and removing items from P duffel bag.

141.    Two men left and P called the police to report the incident.

142.    Multiple OLPD squad cars approached P.

143.    P was questioned by multiple officers.

144.    P was put in handcuffs and P cell phone confiscated and P taken to OLPD.

145.    P did not commit any crimes and  there was no probable cause.

146.    No criminal charges were filed against P re this incident.

147.    P was released from custody at the OLPD.

148.    P returned property that police had confiscated including wallet and keys.

149.    P requested his cell phone

150.    Police did not return P cell phone.

151.    Police still have P cell phone.

152.    On or around March 19, 2021 the Village of Oak Lawn posted or caused to be posted on P front door an order under threat of arrest by the OLPD.

153.    No basis in law for this order has been cited by the Village of Oak Lawn.

154.    Said order is in violation of P and family and friends civil rights as per the fourteenth amendment in that it restricts liberty and pursuit of happiness inside his home without due process of law.

155.    Said violation of the fourteenth amendment is under the color of law in that it threatens arrest and prosecution for noncompliance.

156.    On or around August 12, 2019 P was walking from his home to 7-eleven store at the corner of 103rd and Central.

157.    P was approached by an OLPD officer on foot as Plaintiff began walking down Central Ave.

158.    Officer had walked out of driveway between two apartment buildings where his squad car was parked with lights off.

159.    Officer detained and questioned P on the sidewalk.

160.    P was released after compliance with questioning.

161.    On or around February 5, 2020 two officers from the OLPD knocked on P door.

162.    P answered the door and was questioned by officers.

163.    P was told to wait at the door while the officer called OLPD.

164.    Officers were not investigating any crime and did not suspect P of any crimes.

165.    Officers left without further incident.

166.    P mother inquired to P as to why police came to her door.

167.    On or around August 28, 2020 an officer from OLPD knocked on P front door.

168.    P answered and did not open door.

169.    Officer questioned P through the door.

170.    There was no probable cause for any type of crime.

171.    Officer was not investigating a lead that a crime may have been committed.

172.    Officer left without further incident.

173.    On or around November 7, 2010 officer M. McNeela and five other officers arrested P nephew, Mark Dzendrowsi at his residence at 10310 S. Mayfield and took him to jail. No crime had been committed, and there was no probable cause of any crime.

174.    On or around May 12, 2018 two male officers from OLPD came to P mothers house at 5840 W. 104th st. unit 315 and questioned  P sister Sharilyn Keeler.

175.    Sharilyn is mentally disabled.

176.    Officers questioned Sharilyn re where she lived and how long she planned to stay at her mother's house and where else she could stay.

177.    Sharilyn informed police officers that she had been staying at her daughter's apartment in Orland Hills, Illinois.

178.    Officers then ordered Sharilyn to leave her mother's house and go to her daughter's house.

179.    Shariln asked the police how she should get to her daughter's apartment.

180.    Officers stated to Sharilyn that they would help her get to her daughter's house.

181.    Officers called Chicago Ridge Cab Company and ordered a taxi for Sharilyn.

182.    Officers escorted Sharilyn out of her mother's house and downstairs to the taxi cab that they had ordered.

183.    Said taxi cab arrived and officers escorted Sharilyn into said taxi cab.

184.    Said taxi cab drove Sharilyn to the Orland Park Mall.

185.    At the mall Sharilyn was confronted by paramedics that took her to a hospital.

186.    On or around July 15, 2014 one male officer from OLPD knocked on Judy Keeler's apartment door.

187.    Judy opened the door.

188.    Said officer questioned Judy regarding the whereabouts of Judy'd daughter Emily.

189.    Said officer did not have a warrant or suspect Emily or Judy of committing any crime. Said officer was not conducting an investigation concerning a

suspected crime.There was no probable cause that anyone committed any kind of crime.

190.   On or around July 31, 2019 P was driving his mother along 103rd st. approaching the stop sign at Major Ave. An officer from OLPD approached P vehicle on foot and began questioning P.

191.   There was not probable cause of any crime that warranted said officer to detain P in traffic at that time.

192.   Said officer did not have a warrant for P arrest.

193.   Officer demanded to see P drivers license.

194.   Officer put P in handcuffs and took him to jail at OLPD.

195.   Officer did not have a warrant for P arrest, and there was no probable cause of any crime.

196.   P mother was detained, placed in a patrol car, questioned, driven by the officer to another location, and released.

197.   At jail P was at intake with two young female officers.

198.   P had already been searched by male officers at arrest and at entrance to intake.

199.   Female officer told P to sit down and she sat directly in front of P.

200.   Female officer began questioning P and put her hand in his t shirt pocket.

201.   Officer asked more questions and then stated that it was necessary to check the shirt pocket again.

202.   Officer put her hand in P shirt pocket again and rubbed it on P's nipple.

203.   Officer stated that "I need to check this again".

204.   Other female officer then stated "She just wanted to feel your pocket again" or something to that effect.

14

205. P was age 60 at that time.

206. On or around January 20, 2020 P friend Thomas Koutsoheras was driving to P house.

207. Koutsoheras was pulled over and detained and questioned while traveling in his vehicle south along Central Ave near 101st st.

208. Koutsoheras was released without further incident.

209. There was no probable cause to pull over or detain or question Koutsoheras.

210. No crime had been committed or was suspected.by the officer.

211. On or around August 10, 2019 P was standing near the front entry of the Kinkora Condo Building where he resides.

212. An officer from OLPD approached P and detained P for questioning.

213. The officer then instructed P that P would not be further detained if P entered the building immediately.

214. It was a nice day and P wanted to remain outdoors.

215. Nevertheless, P went inside under duress of further detainment and incarceration.

216. OLPD officer was cognizant that there was no probable cause for any crime.

217. OLPD officer did not suspect P of committing any crime.

218. On or around July 3, 2019 Plaintiff was shopping at the 7-eleven store at 10222 S. Central Ave. in Oak Lawn. An OLPD officer entered the store and detained P and began questioning P. P was released without further incident.

219. On or around September 29, 2019 P was travelling on 103rd st. eastbound when P stopped at the stop sign at Major Ave.

220. An officer from OLPD approached P vehicle on foot without identifying himself and detained P in traffic without probable cause of a crime and questioned P as to his destination.

221. Officer contacted OLPD by phone.

222. Officer returned to P vehicle still at the stop sign and instructed P that he was no longer detained and free to go.

223. On or around July 1, 2019 P niece Leah Dzendrowski was at the Oak Lawn Library.

226.

227.

228.

## COUNT I
## UNLAWFUL IMPRISONMENT

229. As listed above D have unlawfully restrained or detained or imprisoned P without probable cause and in violation of P civil rights and under the color of law as per departmental and village customary practices.

230. OLPD officers restrained and incarcerated P without having reasonable grounds to believe that P committed an offense.

## COUNT II
## UNLAWFUL SEARCH AND SEIZURE

231. D have unlawfully seized P property under the color of law (car, items in backpack, cell phone).

232. D seized P property without due process of law.

233. D Officers' conduct was as per departmental and village customary practices.

## COUNT III
## MALICIOUS PROSECUTION

234.   OLPD engaged in a pattern of initiating criminal proceedings against P maliciously and without probable cause and under the color of law.

235.   None of said criminal proceedings initiated by OLPD from time to time over the last eleven years against P, family and friends have resulted in an indictment by a grand jury or a charge filed by an Illinois prosecutor.

236.   Said criminal proceedings have terminated as per Illinois law.

237.   Said criminal proceedings were considered by Illinois prosecutors to determine whether or not they were valid and warranted any action.

238.   Said criminal proceedings were not determined by Illinois prosecutors to have probable cause.

239.   Said criminal proceedings were found by Illinois prosecutors to fail to state a case.

240.   All of the above determinations by Illinois prosecutors are in P favor. Thereby said criminal proceedings have terminated in favor of P.

241.   OLPD has initiated multiple and several kinds of criminal proceedings against P. as described above.

242.   All and every one of said criminal proceedings has been terminated for failure to state a case as determined by Illinois prosecutors.

243.   Said terminations mean that the state of Illinois did not sign off on even one of the many criminal proceedings initiated by D against the P. family and friends.

244.   That means that the state is not in agreement with the Village that they should prosecute P. or family or friends even after the village has initiated many criminal proceedings against P, family and friends during the last ten years.

245. That constitutes a favorable outcome for P because thereby the state has determined that there is no probable cause in any of the criminal proceedings initiated by the Village and OLPD.

246. None of said criminal proceedings have resulted in an indictment by a grand jury or a charge filed by an Illinois prosecutor.

247. No department or agency of the state of Illinois or the Village of Oak Lawn has determined that said initiations for criminal proceedings are substantial and compelling so as to warrant any investigation or prosecution or continuation of any kind.

248. As concerns the state of Illinois and the Village of Oak Lawn and the United States of America, P is absolved and exonerated and found innocent as to all each and every of the initiations of criminal proceedings against him created by OLPD.

249. As such, each and every of the multiple criminal proceedings initiated by Defendant against P fail to survive the earliest stages of due process.

250. Said initiations of criminal proceedings from OLPD could have resulted in P incarceration for multiple years

251. Thereby said termination of the initiation of criminal proceedings against P is in P favor in two independent ways.

252. D had an improper motive for their pattern of detaining and arresting P, family and friends in that any proper motive would have included the need for probable cause as mandated by the legislature.

253. D had improper motive for questioning P, family and friend in that D were not responding to a report of a crime or suspected crime when they conducted said questioning. D failed to advise P, family or friend of their rights during questioning.

254.    Improper motive is further indicated in that it was not D job to come to a citizen's house to make sure they are raising their children correctly.

255.    It was not D job to go to Sharon Keeler's house when she never called them and nobody reported a suspected crime.

256.    It was not D job to intervene in a family disagreement or argument where no crime was committed or suspected or articulated.

257.    It was not D job to make travel arrangements for one family member in response to the complaints of another family member.

258.    It was not D job to trick a mentally ill family member into involuntary admission into a psyche ward by telling her she will be going to her daughter's apartment and then covertly ordering an ambulance to surprise her on the way.

259.    Since D was engaging in activities not included in their job description, the motive for engaging in said activities was definitely not to properly do their job.

260     Any motive by police officers outside of properly doing their own job is an improper motive.

261     OLPD officers have shown a pattern of improper motive for actions with P, family and friend.

262     The above allegations assumed to be true point to routine practices and procedures that disregard municipal and illinois state law when it interferes with the agenda of the OLPD and or the Village of Oak Lawn.

263     P has been injured by D pattern of initiating criminal proceedures against P without any basis in local or state or federal law.

264.    D have destroyed P personal and business reputation when they entered into the public record that P was arrested for indecent exposure.

265.    D were aware that said item entered into public record was not based on any law and was misleading to the public as to what took place and as to whether

P is a sex pervert that cant help dropping his pants even around police, or whether P just did not have the right belt on for getting handcuffed, searched, and pushed and pulled thru the park by police officers.

266.    Illinois prosecutors declined to pick up charge for indecent exposure as it was not based on any law or extension of any law.

267.    Illinois prosecutors declined to pick up any charge that OLPD ever initiated against P, family or friends as not one of them was based on any law or extension thereof.

268.    Thereby all criminal proceedings initiated by OLPD against P family and friends were based on something other than municipal or Illinois or federal law.

269.    As such, the motive for said initiations of criminal proceedings was not to uphold the law.

270.    Thereby the motive for said multiple attempts to initiate criminal proceedings was improper.

271.    The Village was aware of the nature of the actions and motives of its own police department in that they worked side by side in the same building and routinely coordinated for many purposes.

**COUNT IV**
**AGGRAVATED SEXUAL MISCONDUCT**

272.    P was age 60 at the time in question and did not consent to female intake officer sexual fondling him two times as alleged above.

273.    P had already been searched twice by male officers at jail and said female officer already had put her hand into P shirt pocket once.

274.    Said officer used coercion in that she indicated that said fondling was necessary for intake procedures.

275.    P believed that he would be physically abused by male officers if he resisted female intake officer.

276.     P had already been physically abused by male jail officers for speaking up on another occasion as alleged above.

277.     Said intake officer intended to engage in the unlawful conduct and she did so knowing that it was wrong or unlawful.

278.     Said intake officer engaged in above sexual misconduct under the color of law.

279.     Second female intake worker coerced P into silence when she informed P that the offending female officer did not need to search him further but she just wanted to feel inside his shirt pocket.

280.     The above conduct by OLPD intake officers is in violation of 18 U.S.C. §

281.     OLPD and the Village were at all times pertinent cognizant that their police officers were engaging in the type of conduct that has been alleged herein.

282.     Said conduct is not based on any law or extension of law, municipal state or federal and was as not punished as per departmental and village customary practices.

283.     By definition the policy makers at the Village keep track of what is happening in the departments so that they may maintain or adjust policies accordingly.

284.     Policy makers at the Village are aware that there is a code of behavior that olpd officers learn, practice, and teach.

285.     Policy makers at the village have established a custom of  failing to investigate citizen complaints and have abdicated their responsibility to train, supervise, discipline, and control their officers.

286.     It is the custom and practiced policy of OLPD to do those actions that it has been doing lately.

287. OLPD and the Village have in place a customary policy to teach and support a police officer conduct code that does not include a probable cause requirement when an officer is considering making an arrest or detaining a citizen for questioning.

288. Said customary policies are the moving force behind the otherwise unexplainably consistent pattern of police officer and supervising officer conduct exhibited above.

289. Said policy is accomodating to an environment where young female officers feel like it's within customary policy to advise a 60 year old man that the reason one of them just put her hand in his pocket while sitting inches away in front of him was not because she was searching him.

290. It was because she wanted to put her hand back into his pocket again after doing it once.

291. For a motive other than searching

292. Any motive outside of searching was improper.

## COUNT V
## EXCESSIVE FORCE

293. HEAD CRUSHING OFFICER used excessive force on P with malicious intent in violation of civil rights and under the color of law as described above.

294. Said conduct was consistent with customary department policy in that several officers and a supervisor were present and nobody protested or intervened.

## COUNT VI
## FAILURE TO INTERVENE

295. OLPD officers R. Carroll badge no. 2262 G. Ferrer badge no. 2268, P. Curran badge no. 2137, and S. McNeela badge no. 2174, stood by and assisted and failed to intervene when officer P. O'Donnell badge no. 2257 unlawfully imprisoned P at library park.

296.    Said failure to intervene is indicative of customary policy of OLPD and Village in that there was no probable cause for arrest.

297.    Said failure to intervene is indicative of customary policy of OLPD and Village in that there was a supervisor on the scene.

298.    Second female intake officer failed to intervene when she noticed that her partner was sexually fondling P with her hands in P pocket and both officers were aware that she was not searching P.

299.    Said failure to intervene is indicative of OLPD and Village customary policy in that said policy strongly discourages holding a fellow officer accountable for his actions under the law.

300.    Said failure to intervene further references customary policy in that the second female intake officer verbally clarified to P that her partner's physical contact was personal and not professional.

301.    Second female intake officer made the above statement as if it were routine practice based on a customary policy.

302.    First female intake officer did not seem surprised by and did not deny what her partner had just said to P.

303.    P further alleges that D acted knowingly, intentionally willfully and maliciously when they violated Illinois law and P civil rights as shown above.

304.    As a result of D conduct, P was injured as follows:
1.    Loss of liberty and enjoyment of life.
2.    Loss of right to walk in any public park as per bond conditions.
3.    Loss of property.
4.    Mental anguish.
5.    Lossed business when OLPD reported " arrested  for indecent exposure" to public information.
6.    Lost income from imprisonment and court dates.
7.    Optical nerve damage from locked up without glaucoma eye drops.
8.    Loss of dignity when searched and handcuffed and sexually molested.

Loss of dignity when D caused circuit court judge to order that P cannot be around children.

9. Loss of family autonomy in that decisions and actions regarding P family were being were consistently being made by the OLPD.

10. Loss of opportunity in that if OLPD was adhering to best practices as per the state of Illinois, then for example Leah would have gotten some support re her social behavior in the context of her severe mental illness instead of being handcuffed, searched, and locked in a cell for two hours and then sent on her way with no more than a good luck not best practices. And no probable cause that a crime was committed. And no crime. And no harm done to anyone so no victim.

11. Loss of family integrity when officer Lupa reported that he had P arrested based on the statements of P family members. This is the same officer who screamed at P when P questioned the right of officer Lupa and his female partner to evict P from his residence without due process and without Cook County which is in charge of evictions. He had a very large and scary black beard when he screamed in P face.

12. Loss of life; OLPD and the Village have, in their normal course of business under their customary policies regarding how to work with with citizens whose behavior deviates from the norm, failed to allow for a avenue that P family and friends may travel upon toward life, liberty, and the pursuit of happines in the Village.

13. Lack of proper medical treatment caused by OLPD failure to follow best practices by checking to see if a citizen might have unplugged the cord outside the library because she is schizophrenic or bipolar and social anxiety disorder and not because she is a criminal that needs to be locked up in jail first thing. That was P niece Leah and she is barely treading water.

14. The loss of self worth that comes with being treated by a community organization like the police like u are so lame and disgusting that they can barely force themselves to talk to you. Unless they are fondling your nipple in which case they dont mind clarifying that it was for fun and not for due process.

15. The hatred that this kind of code of conduct instills into the entire village. Hatred leads to nothing but widespread damage. Like a cancer, the damages cause death. So the damages include a cancer in the community that could be fatal.

305. Plaintif requests that the case be tried by a jury.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff accordingly and respectfully demands judgment against Defendants as follows:

1. That Plaintiff be awarded general compensatory damages in an amount to be determined at trial;

2. That Plaintiff be awarded statutory damages in an amount to be determined

at trial;

      3. That Plaintiff be awarded punitive damages in an amount to be determined at trial;

      4. That Plaintiff be awarded his attorney's fees and costs in this action; and

      5. That Plaintiff be awarded any such other and all relief to which he may be entitled as a matter of law and as deemed appropriate by this Court.

PLAINTIFF,

Dated April 1 , 2021           *Kevin Keeler*

Kevin Keeler pro se
5840 W. 104th Street unit 315
Oak Lawn, Illinois 60453
(708) 289-4290
kevinjohnkeeler@gmail.com

306.   Plaintiff has not previously filed a case in this district.